# Charleston.

|      |     |
| ---- | --- |
| 5    | 301 |
| 53   | 335 |

|      |     |
| ---- | --- |
| 5    | 301 |
| 61   | 481 |

A. F. Donnally *et al. vs.* Parker, Beale *et al.*

January Term, 1872.

The following article of agreement or contract, on the 12th of March, 1856, is entered into:

" We hereby agree to sell and convey to Milton Parker our interest in a tract of land patented to John Steele, of 27,000 acres, and a tract of land lying on the waters *Pocotalico,* and running into Elk river, for seventy-five cents per acre one-third of the purchase money to be paid in good acceptances not to run more than three months, and residue of said purchase money to be paid in equal installments of one, two, and three years, with interest from date of deed, but it is understood and agreed that the said Parker is to have till the first day of July, 1856, to elect whether he will take either or both tracts of said land upon the terms and conditions aforesaid, and it is understood and agreed that the said Parker may elect either of said tracts of land, but is not compelled to take both, but should he elect to take neither, then this contract is null and void; but should said Parker elect to take said tract *or either* of them, he binds himself to pay for said land at the rate of seventy-five cents per acre for land so elected to be taken by him in the manner aforesaid.

" Witness our hands and seals, day and date as above.

|                          |          |
| ------------------------ | -------- |
| " M. Parker,             | (Seal.)  |
| " Wm. Donnally.          | (Seal.)  |
| " A. F. Donnally.        | (Seal.)" |

It is acknowledged and entered of record in the proper office on the 17th of the same month. P. gave notice of his election to take the Steele tract before the expiration of the time allowed for the purpose, and notified the D.'s.of that fact. Held:

I. It was an executory contract which became completed between the parties on the notice of P., and might have been specifically executed in a court of equity.

II. When P. made his election under the contract, and gave notice thereof, his equitable interest in the Steele tract related back to the date of the contract.

III. The provision in the contract giving to P. the right of election, was sufficient to put the creditors of the D.'s on inquiry (the contract being recorded), and they were bound to inquire whether such election was made or not.

The bill in this case was filed at January rules, 1858, by Parker, Beale and others, creditors of Andrew F. and William

Donnally. The decree in favor of the creditors from which the appeal was taken to this court, was rendered on the 30th of November, 1870, in the circuit court of Kanawha county. The sole question determined by this court was whether the contract made between the Donnallys and Parker, on the 12th of March, 1856, and acknowledged and recorded on the 17th of the same month, for the sale of the land in controversy, was valid and passed the title to Parker.

This contract appears in the opinion of judge Maxwell, together with such other matters and proofs as will exhibit the point at issue.

The cause was brought to this court by defendants Hickok and Allen.

*Smith & Knight* and *G. Parker* for appellants.

If the creditors prevail, therefore, it must be from some *technical legal* defect in the respondent's title, which certainly this court, sitting as a court of equity, will be disposed to regard with charity, if any such defect exists.

Let us, then, carefully examine, with the law, the contract between the Donnallys and Parker, dated March 12th, 1856, which was signed and *sealed* by all the parties, and acknowledged by two of them on the same day, and by the other on the day following, and duly recorded on the 17th of the same month. So far, then, there is no legal defect. And is there any in the *form* and *structure* of the writing itself to prevent its meeting substantially the requirements of the law then in force? It is under *seal*, which implies and imports a *sufficient* consideration. 2 Black. Com., 445–46; 2 Kent's Com., 11 Ed., 464–5, and note; *Page* vs. *Truefant et al.* 2 Mass., 159; *Austin, Administrator,* vs. *Whitlocks, Executor,* 1 Munford, 487. There is, then, sufficient consideration to make a contract binding on *all* the parties. See also *Sumner* vs. *Williams,* 8 Mass., 200.

Now what does it say of itself? What have the parties themselves called it? It begins; "*Articles of agreement made and entered into this* 12th *day of March,* 1856, *between A. F. Donnally and William Donnally, of Kanawha county, State of Virginia, of the one part, and Milton Parker, of the county and State aforesaid, of the other part.*"

" *We hereby agree to sell and convey* to Milton Parker our interest," &c., describing with sufficient accuracy the *two tracts of land, the price, and how the payments are to be made.*"

Is it possible to conceive of a more perfect and binding form of contract, if it had stopped here ?   Here are competent parties, the *aggregatio mentium,* sufficient consideration, subject matter defined, and price and mode of payment fixed.   These certainly are all the essentials of a valid contract.

But it does not stop here, but proceeds :  "But it is *understood* and *agreed,* that said Parker shall have till the 1st of July then next, to *elect* whether he will take both tracts, one, or neither ;" and closes thus :  "But should he elect to take *neither,* then this contract shall become null and void ; but if he elects to take said tracts, or either of them, he *binds* himself to pay at the rate of seventy-five cents per acre for the land so elected to be taken by him."

Is not the *aggregatio mentium* here perfect throughout the entire instrument ?   We are unable to conceive how it could be more so.   All the law requires to make a valid contract in this respect, is *the coming together of competent minds.*  How they *shape* their contract after coming together, the law is indifferent, provided they don't infringe the law itself.   To impose any other restraint upon individuals in forming their various agreements would war against the whole spirit and genius of the law of contract. · They may make it absolute as to both parties, or conditional as to both, *or to one*—giving an option to one party, as in the present case.   How they fix it, in this respect, in no way effects or impairs the validity and completeness of the contract.   2 Parsons on Con., 657 ; *Disborough* vs. *Neilson,* 3 John. Cases, 81 ; *Giles* vs. *Bradley,* 2 do. 253.   Chitty on Con., 2d Am. Ed., 6, note.

Nor does it make any difference whether the option relates to the *whole* or only a part of the subject matter.   See authorities last cited ; also *White, Administrator,* vs. *Toncray,* 5 Gratt., 179.   This was covenant on sealed articles where one party had an "election," and the future liability of either, low water prevented.   This was held complete at its inception. See also 2 Kent's Com., 11 Ed., 465—note c :  "If an agreement be *optional* on one of the parties and obligatory on the other, it does not destroy the mutuality, if there be a suffi-

cient consideration on both sides; as if one party stipulates he will deliver salt *when called on,* and the other that he will pay when so delivered. This is mutuality, and one promise is in consideration of the other." *Cherry* vs. *Smith,* 3 Humph (Tenn.), 19; *Lester* vs. *Jewett,* 12 Barb., N. Y., 503; *L. Amoureaux* vs. *Gould,* 3 Seld., 349.

Here it was wholly *optional* whether the one party "called on the other for the salt," as it was with Parker in the case at bar, whether he elected to take either of the tracts of land; but if the former called for the salt, or the latter elected to take either tract of land—they were equally obligated to pay the stipulated price; and Donnallys could not terminate Parker's option before the 1st of July, as the *sealed* instrument gave him to that time, if only a proposition before he made the election. So in the case of *Disborough* vs. *Neilson,* it was wholly optional with the plaintiff whether to tender the additional three hundred barrels of meal, and the defendant could not compel him to do it; yet when done, the defendant was bound to receive and pay the stipulated price. Chief justice Kent was a member of the court that gave this decision, and also that of *Giles* vs. *Bradley,* ————. See also the English cases referred to in these cases. See also 2 Kent's Com., 478, 11th Ed., note, showing the case of *Cooke* vs. *Oxley,* and other early English cases, as respects mutuality in parole contracts, are no longer authority in that or this country. See also *Warrell* vs. *Munn,* 1 Seld., 229, and recent case of *Justice* vs. *Long et al.,* reported in American Law Times of January number, '71, p. 14, where the essential elements of a binding contract, and requirements of the statute of frauds, are elaborately discussed and authorities examined by the court of appeals of New York.

We affirm, therefore, that the instrument in question was a perfect *contract* at its *inception,* and could be terminated only in the manner expressly agreed by the parties, viz: upon Parker's failing to take either tract; *and the burden of proving such failure is on the creditors.*

The evidence proves Parker did elect to take the land in controversy within the time specified, and so the contract was not terminated, but continued agreeably to the express agreement of the parties, that it should continue in that event.

The notion that *both* parties must have *present* right of action, or be simultaneously bound, in order to make a valid contract, is wrong—subversive often of such contracts as are dependent or conditional.

Where, then, is the reason, sense or law for calling the writing a mere *proposition*, which, *ex vi termini*, necessarily excludes any *aggregatio mentium at all.* For the moment this takes place it ceases to be a proposition and becomes a contract—whether with or without condition or option, makes no difference. This we submit is the true distinction between a proposition and contract.

Suppose Donnallys had given Parker their single bond, or one with penalty, as in the case of *Page* vs. *Trutant et al.*, before cited, containing the same conditions mentioned in the writing in question, and Parker had *accepted* and got it duly recorded and made the election, and paid the money as in the present case—is there a question this would have been sufficient against creditors *after*, as well as before July 1, 1856? Can the form of contract adopted, to which Parker became party by signing and sealing also, be viewed by the court as possessing less mutuality, or being less sufficient?

Nor did this recorded contract lose its protecting influence or become merged by Donnallys giving the deed to Parker the 30th of September, 1856, which got mislaid and was not recorded till April 3, 1858, when it took the place of the contract as to creditors and purchasers, subsequently. See *Withers* vs. *Carter and als.*, 4 Gratt., 407, which is exactly the present case in this respect, and decisive of it. Whether the loss of the deed was temporary or permanent, makes no difference in principle.

But still our opponents may undertake to say that the writing was only a *proposition* when executed, acknowledged and recorded, and that there was no mutuality or *aggregatio mentium* making it a contract until Parker made his election, which he should have done in writing duly acknowledged and recorded before there was any such *recorded* contract, as § 4, chap. 118, Code of '50, p. 508 requires.

Now what does that section say it requires in this respect? "*Any* contract in writing *made in respect to land*, or made for the conveyance or sale of real estate," *shall be as valid against*

39

*creditors*, &c., when acknowledged and recorded, "as if the contract was a deed conveying the estate or interest embraced in the contract." This section puts recorded contracts and title bonds on the same footing, and makes them in all respects equivalent, so far as being notice is concerned, as recorded deeds that pass the legal title.

"*Any* contract in writing made in respect to land" or "made for the conveyance or sale of real esttate." The section does not undertake to say of what form or structure such a contract shall be, or define its qualities or attributes, but refers this wholly to be determined by the common law, and the then existing statute law of Virginia, and to this last let us advert.

And first, to Virginia's statute of frauds touching sales of real estate, passed as early as November 30, 1785, 1 Code '19, 372, § 1, and the decisions of her courts upon it. In the Code of '50 the same clause is substantially enacted, except the latter dispenses in express terms with the necessity for stating the consideration in the writing. See Code '50, p. 580, which the English law, it would seem, had made necessary. These prohibited any action being maintained on such promise or agreement, "unless the contract or some memorandum or note of it was in writing and signed by the party to be charged thereby, or his agent. We refer also to the acts referred to in the marginal note of § 4, before cited, 1 Code 19, p. 362, chap. 99, § 2. "No covenant or agreement where land is charged to be valid against creditors," &c., unless, &c.; and also same, p. 365, § 13, being the act of '13, which provides that "every title bond or other written contract in relation to land" may be proved, certified, acknowledged and recorded in the same manner as deeds, and when so, to be evidence of their *existence*, to creditors, &c., without giving the additional force the Code of '50 gave to recorded contracts.

Now in all these instances is it not fair to infer that the legislature intended an agreement so evidenced by writing signed by the party, as takes it out of the statute of frauds, as 'tis termed, and so that her courts of equity decree upon it specific performance. It seems to us such was its intention. And if section 4 contemplates any other contract, or one to be evidenced or proved in any different manner, we ask our

opponents to point the court to the authority anywhere in Virginia law for the distinction.

Now let us see what construction the courts of Virginia have put upon these provisions. How far they hold such contracts must be in writing, and how far they may be proved by parole evidence. Before the Code of '50 dispensing with the statement of the consideration, her court of appeals de-decided the "memorandum or note" mentioned must amount to a *contract* in order to meet the requirement. *Johnson* vs. *Ronald, Adm'r,* 4 Mumf., 77; *Smith* vs. *Jones,* 7 Leigh, 165, in which the former decision is approved.

In the former case, the contract was evidenced by a letter, written by Ronald to Johnson, promising to sell and convey him certain lands "according to their agreement," without stating what that agreement was. It was held sufficient under the statute of frauds to decree specific performance upon—the court admitting parole evidence to prove what the agreement referred to was, and also the taking in of the note which was his part of the contract, *after* suit brought.

These cases are decisive against any such supposed objection, unless it be shown that the fourth section refers to some other kind of contract than we have supposed, which cannot be done. The true rule being, we submit, to admit parole testimony to prove all acts *in pais,* or *aleunde* called for by the writing having the essentials of a contract, when such parole evidence is not inconsistent with the writing, but auxiliary to it—as the evidence proving the election made by Parker, or performance of other conditions existing *in pais.* Such evidence is not required to be in writing, acknowledged and recorded. 1 Greenl. Ev., §§ 275, 276, and sequiter.

Now let us examine the contract in question with respect to the fourth section, in another aspect. That section expressly declares that the contract "shall be as valid and of course as effectual against creditors, &c., as if it were a deed conveying the same land." Let us then consider it as being such a deed, actually passing the title to the land, and containing the same stipulations as to Parker's option, and that deed duly acknowledged and recorded as the contract was. What would be its effect as against creditors, &c.? What effect is given to duly recorded mortgages, deeds of trust, and

other instruments passing the title, but containing various
clauses of defeasance, stipulations, &c., after, as well as before
the time fixed for performing the condition or stipulation?
We all know they are *notice* to all the world, *after*, as well as
before condition broken—upon the legal presumption that
title to real estate, when once vested, continues so until
proved to be divested. To rebut this presumption, the legis-
lature of West Virginia recently passed a law requiring the
mortgagee or lienor to execute and acknowledge a release,
which when recorded, shall conclusively rebut this presump-
tion. Code of W. Va., 477-8. In this view, which it seems
to us is correct, the burden was upon our opponents to have
shown that Parker had failed to take *either* tract, and so the
contract had become void by the happening of the only event
which the parties had agreed should terminate it. Until our
opponents had shown this, the contract in contemplation of law
continued, and was sufficient notice without the respondents
having proved that Parker had made any election. *Leighton*
vs. *Stephens*, 19 Me., 154. There the vendor claimed property
he had conditionally sold, against the creditors of the vendee.
The court held the burden was on him to show the sale con-
ditional, and that the condition had not been complied with.
In the present case the creditors stand in the shoes of the
vendor, and the respondents in those of the vendee's creditors,
in principle. See also *Hughs* vs. *Wilkinson*, 37 Miss., 782, cited
and approved in 3 Washburne on R. P., p. 275. It was held
where a deed was given conveying the estate, which con-
tained a stipulation that the grantee should have two years
to elect, whether to pay the purchase money, and in case he
decided not to, the title to revert. Parole evidence was ad-
mitted to prove his failure to pay within the time, and that
the title had reverted. This is on the principle that when
the act *in pais* or *aleunde* on which the condition depended
took place, that moment the deed itself *proprio vigore executed*
the rest, which in that case was to revest the title—such act
or event *in pais*—being proved by parole evidence. Just so
with the instrument in question. The moment Parker elected
to take the land in controversy, the contract itself from its
own intrinsic vigor vested Parker with an absolute equitable
estate in fee simple, which before was conditional. This self

executing power, when the fact *in pais* happens, is·expressed
in the recorded writing, and is enough to put all parties upon
inquiry as to whether·the act or event *in pais* has·taken place
or not—the burden being on the party seeking to terminate
the estate or contract, to prove the. fact happening *in pais;*
otherwise the estate by intendment of law, continues; 4
Kent's Com., 126–7; *Talman* vs. *Snow,* 35 Maine, 342. The
contract by the fourth section is made equivalent to ·a deed
that passed the title—so far as imparting notice is concerned.

If this court should affirm the decision of the court below,
it would overthrow half the titles in the State. We all know
the title to a large portion of her lands rests on recorded.con-
tracts, or title bonds, as they are usually called—containing
all sorts of informality, conditions, and stipulations of every
kind. Suppose it be now decided that all·the acts *in· pais* or
*aleunde,* as Parker's election was, growing out of, and called for
by these various writings, must be proved by some writing,
signed, acknowledged and recorded—how many think you
would stand the test? Not one in twenty. Or suppose this
court should decide that no recorded mortgage, or deed of trust,
should give security to the holder against the creditors or
subsequent purchasers of the grantor, *after·* the time fixed
therein for payment, or performance of other condition—what
would be the result? We only make this suggestion to show
the consequences that must follow an affirmation of· the decree
of the court below, and that the court ·may fully appreciate
its importance to the whole community.

We therefore repeat the proposition : that all acts *in .pais,*
growing out .of and called for, and not inconsistent with the
written contract, may be proved by parole ·testimony, and not
necessarily by recorded writing.

We say, then, first : the writing in question was a complete
contract at its inception. Second, that if it were otherwise
—upon Parker's making the election, it became so, and vested
in Parker an absolute equitable estate, in fee· simple, and this
from the proper and intrinsic vigor of the writing itself, with-
out any further recorded evidence. Third, ·that in either
aspect it met the requirements of the fourth section before men-
tioned, and repelled all judgment liens absolutely. It was
sufficient to have put all parties upon inquiry, by which they

would have soon learned what had been done in regard to the stipulation or option given therein to Parker, which is sufficient in a court of equity. *Smith* vs. *Low,* 1 Adkins, 490; *French* vs. *Loyal Company,* 5 Leigh; Judge Carr's opinion, 643; who, after discussing the English and American authorities on the point, adopts as the true rule laid down in *Smith* vs. *Low,* "Whatever is sufficient to put a party upon inquiry, is good notice in equity." Also *Daniels* vs. *Davidson,* 16 Vescy, 249; 17 Ib., 439. In this case Daniels, while in possession as tenant of Davidson, had taken an agreement to purchase the fee. While thus situated, Cole purchased the fee of Davidson; Daniels filed his bill for specific performance; Cole testified that he had no actual notice of such agreement at the time he purchased. But the court decided the fact of Daniels being in possession was sufficient to have put Cole "upon inquiry," which imputed *mala fides,* and avoided his deed.

The record in the present case shows the respondents took actual possession in October, 1856, and have continued it since, paying the taxes which have been assessed to them on the commissioner's books, and their share of the expense of partitioning. This possession was taken six or seven months before any of the judgments were recovered, and even before the debts were contracted. This was sufficient, then, to have put the creditors "upon inquiry."

But we maintain the evidence shows they had actual notice that their debtors had ceased to own the land in controversy. Is not the acceptance by Hale, the principal plaintiff in the cross bill, and one of the grantees in the deed of trust from Donnallys in October, '57, undertaking to convey all their property, particularly describing each parcel—but not mentioning the land in controversy—with his conduct since sufficient evidence of actual notice? Is not the claim made in the original bill to set that deed aside, because it undertook to convey all the debtor's property, sufficient evidence that the original plaintiffs, and all creditors becoming parties afterward, knew their debtors had ceased to own the land in controversy? Did they not in the most solemn manner acknowledge the fact, and has not all their conduct since been in accordance therewith, until this cross bill, which was purely an after thought, was gotten up after having squandered and sacrificed the large assets of their debtors?

But to shelter themselves from this inevitable conclusion, these creditors may say such notice cannot affect them, as it only applies to subsequent purchasers for valuable consideration, and cite *Guerrant* vs. *Anderson,* 4 Rand., 208, and perhaps subsequent decisions, under chap. 99, 1st Code of '19, p. 361. The construction given to that chapter in this respect, to say the least, is questionable. A just interpretation of its fourth section does not seem to us to warrant the decision. An accurate, grammatical construction, as well as legal, makes the word "notice" apply to *creditors* no less than subsequent purchasers for valuable consideration. Nor can the last clause of that section be legally interpreted to limit or restrict what precedes—as the last clause contains no express restrictive terms; nor is it inconsistent.

But be this as it may, the Code of '50, § 5, p. 118, which governs the present case, omits all the clauses in the old statute which the court relied on in making the decisions aforesaid. Therefore § 5 of the Code of '50, as it now stands, is to receive a construction for the first time from this Court; and we earnestly insist that it give a construction that shall comport with the language, reason and spirit of the law, and as shall harmonize with the construction given to similar statutes by the courts throughout the country, viz: that the *mala fides* applies to all who seek by whatever means to get away another man's land, when they know or have good reason to know, he has purchased and paid for it—whether the means they adopt be subsequent deed or judgment lien. 3 Washb. R. P., 3 Ed., 290, note, where the decisions of the courts of the different States are collected. See also the reasoning of the court in *Priest* vs. *Rice,* 1 Pick 164, and the cases referred to. See also Virginia Code of '50, p. 709, § 8. A judgment though not docketed is declared good against a subsequent purchaser for valuable consideration, but with notice of such judgment. Reverse the priority in date of their claims, and is there not stronger reason for postponing the docketed judgment when the creditor knows, while getting the debtor to confess judgment which he gets docketed, that his debtor had previously conveyed the land to a *bona fide* purchaser who had paid the purchase money, and was then in actual possession, though the deed was not recorded? The

judgment lien is general, while the conveyance is of specific property, evidenced by transfer of possession. A court of equity can hardly put the purchaser on less advantageous ground; or fail to regard the cogent evidence this provision furnishes—when taken in connection with the very material change of chap. 99, 1 R. C., p. 361, by Code of '50, chap. 118—as proof that the latter intended to put creditors and subsequent purchasers with notice on the same footing, as equity and common sense puts them. The respondents, Hickok and Allen, purchased *bona fide* from Parker, and paid the purchase money, and took possession, relying upon the validity of Parker's title, and have continued that possession since, expending moneys as before stated, which purchase money Parker at once paid the Donnallys, increasing thereby their assets five fold more than any of their creditors would then have paid for the land,

And there is another ground on which these plaintiffs are barred in a court of equity at least, viz: estoppel, waiver, or abandonment. What more unconscionable claim could be made to a court of equity than that made by the present plaintiffs, standing, as the evidence shows them to stand, in respect to the respondents. The legislature never intended judgment liens, if acquired, should uphold fraud, and hence confided their enforcement exclusively to equity jurisdiction.

If A. stand by and see B. honestly purchase land he owns, of another person without objection, equity closes his mouth forever after. Apply this well established principle of equity to the present plaintiffs, and where are they?

How, then, does the evidence present the parties to the *conscience* of this court? The creditors, after solemnly renouncing the land in controversy and disclaiming it as belonging to their debtors, spend ten or twelve years in dissipating assets for which they were offered two hundred thousand dollars in '65, but refused; have acquiesced for twelve or thirteen years in the respondents' possession, in their large expenditures about the property, now have the audacity to appeal to the conscience of this court to turn these respondents out of their possession, and give the land to them—land that fourteen years ago both they and their debtors regarded only as a worthless fragment of their then vast estate. Both

the law and the equity are with the respondents. To uphold such a claim as the creditors', would be monstrous!

Even if the writing between Donnallys and Parker was technically defective at law as a contract—which is not the case—the payment of the purchase money to Donnallys, and entry into possession by respondents, October, '56, six months before any of the judgments were recovered, would have invested them with the *equitable* title, while the Donnallys held the legal title in trust only, and so not subject to judgment liens of Donnallys' creditors subsequently recovered—and this equitable title such a writing would strengthen. *Withers* vs. *Carter et als.*, before cited, and authorities referred to by Judge Baldwin in giving the opinion of the court—especially Lugdon on Vendors, and cases: *Burgh* vs. *Francis ; Taylor* vs. *Wheeler ; Finch* vs. *Earl of Winchester,* and *Coleman* vs. *Cocke.* The *mode* of raising equitable title valid against subsequently recovered judgments established by these authorities, neither the registration law, statute of frauds, nor that for docketing judgments, in Code of '50, restricted or modified.

*Miller & Quarrier* for appellees.

The record presents for adjudication a controversy that has arisen between the judgment creditors and the defendants, Hickock and Allen. The creditors contending that the undivided interest formerly owned in the Steele 27,000 acre tract of land by A. F. and W. Donnally, is subject to the lien of their judgment against the said A. F. and W. Donnally, while Hickock and Allen claimed to hold the land free from their lien.

On page 28 of record will be found the date of the judgments of the petitioners, together with the time of docketing the same:

| CREDITOR. | DATE OF JUDGMENT. | DATE OF DOCKETING: |
|---|---|---|
| John P. Hale | May 23, 1857 | May 23, 1857. |
| John B. Smith | August 23, 1857 | November 11, 1857. |
| H. H. Hopkins | May 25, 1857. | November 11, 1857. |
| Robert M. Sims | February 15, 1858 | March 5, 1858. |

The deed from A. F. and W. Donnally to Milton Parker, who is the vendor of the defendants Hickock and Allen, is

40

dated September 30, 1856, but is recorded April 3d, 1858, while it vested the title of A. F. and W. Donnally in the said Milton Parker; yet on account of the failure to record the deed before the docketing of the judgment, the lien of the petitioners' judgments, which are duly docketed, were not obstructed by said deed. See Code of West Virginia, chap. 74, § 5; also chap. 139, § 5, 6 and 7.

In fact, the appellants, neither in the court below nor in their written arguments filed here, have relied on the said deed, but rather upon what they call a contract, which is found upon page 33 of the record, and to the terms of which paper the attention of the court is especially called.

Now, it is candidly admitted that if the paper found on page 33, and which is dated 12th of March, 1856, and recorded 17th March, 1856, was a perfect contract *at the date of its recordation*, and that nothing remained to be done by either of the contracting parties, *at that time*, and if *at that time* Parker was bound to buy, as much as Donnallys to sell, then the contract being perfect and prior *in time*, to the judgments, the decree complained of, is erroneous.

But it is submitted that under the terms of the 4th and 5th sections of chap. 74 of the Code, which are the exact words of the Code of 1850, the paper, the recordation of which, protects the contracting party against creditors, as perfectly as if the same was a deed, must be at the date of *its recordation*, a perfect contract; if it lacks any of the essential elements of a contract at that time, then it is not a contract, and does not protect the party recording it. The statute authorizes the recordation of contracts, and gives great virtue to such recordation, it does not authorize the recordation of a proposition to contract, which, at some future time, may ripen into a perfect contract; nor does it give to such recordation of a proposition to contract any force or validity whatever.

It then becomes necessary to inquire whether the paper writing, found on the 33d page of the record, and signed by M. Parker, Wm. Donnally and A. F. Donnally, was, on the 17th day of March, 1856, a contract or a proposition to make a contract. The paper recites that the Donnallys "*agree* to sell and to convey to Milton Parker our interest in a tract of plan patented to John Steele, of 27,000 acres, and a tract of

COURT OF APPEALS OF WEST VIRGINIA.            315

Jan'y Term,        Donnally et al. vs. Parker, Beale et. al.            1872

land lying on the waters of Pocotalico, and running into Elk river, for seventy-five cents yer acre." Here is the proposition on the part of the Donnallys, and it is admitted that if Parker had then and there accepted the proposition and promised to pay the seventy-five cents per acre, it would have constituted a contract, which, the proposition and acceptance both being in writing, might have been recorded, and if recorded would have protected the party who accepted the same, against the lien of subsequent judgments.

In order to ascertain, whether or not Parker accepted this proposition, it is only necessary to quote from the paper : "It is understood and agreed that the said Parker is to have till the first day of July, 1856, to elect whether he will take either or both tracts of said land, upon the terms and conditions aforesaid, and it is understood and agreed that the said Parker may elect either of said tracts of land, but is not compelled to take both, but should he elect to take neither, then the contract is null and void, but should said Parker elect to take said tracts, or either of them, he binds himself to pay for said land, at the rate of seventy-five cents per acre, for the land so elected to be taken by him, in the manner aforesaid."

It is obvious that the Donnallys had obtained their own consent to sell one or both or either tract of land to Parker, at seventy-five cents per acre. But is equally plain that Parker had not obtained *his* consent to buy, because he retained the right "till first day of July, 1856, to elect whether he would buy either or both or neither of said tracts. The consent was only on one side ; there was no contract or agreement, no "*aggregatio mentium.*" The mind of the Donnallys went out to meet Parker, but Parker's mind did not respond, but took time until 1st July, 1856, to determine whether there should be an "*aggregatio mentium.*" In the meantime the paper, before it became a contract, and before there became an "*aggregatio mentium,*" and while it was a mere proposition, went to record.

Now it might be interesting to test this paper, to see if it possessed on the day of its date or of the day of its recordation the usual qualities of a contract. Could the Donnallys have enforced it on either of those days, and made Parker pay the seventy-five cents per acre ? Clearly not, because, he had until 1st July to elect whether he would take the land or not.   It was

then a contract according to appellants counsel, by which the Donnallys had sold their land but they could not collect the purchase money.

Again, if it was a perfect contract in the days of its date and recordation, it bound both tracts of land, and if it protected and shielded the 27,000 acre tract from the lien of the subsequent judgment creditors, it protected the Pocatalico lands as well, yet the appellants do not claim to own the Pocotalico lands, and as is conceded they have been sold by decree rendered in this cause to satisfy judgment liens, which were prior to the date of the judgments of the petitioner. Yet as the paper stood in the days of its date and recordation, no man can point out any difference in the position of the two tracts.

The construction placed upon the paper, miscalled a contract by the appellant, would defeat the policy of the registry laws, whose object was to give notice to creditors and purchasers so that creditors would not give credit to a party upon the mistaken notion, that he was the owner of real estate, or that the purchaser should not buy land from a party who had no title. Yet how could either creditor or purchaser tell on the 18th day of March, 1856, who was the owner of either or both of said tracts of land? If that paper was or was not a contract, by the mere volition of Milton Parker and without any further writing or contract, either or both tracts could become the property of the Donnallys or of the said Parker, as the latter might elect. And it would follow, as a logical sequence, that if a party obtained judgment against the Donnallys on the 18th day of March, 1856, and docketed his judgment on the same day, he would or would not have a lien on either or both, or neither, of said tracts, as Parker might elect any time in April, May or June following.

The paper must be a perfect contract, and contain all the elements of a contract on the day of its recordation; otherwise it is void as to creditors and purchasers, under the 4th and 5th sections of chap. 74 of the Code. Now, its is not contended that Parker accepted Donnallys written proposition, either at its date or at the date of its recordation. If it had been so accepted, the acceptance would have been endorsed on the proposition, and a perfect written contract having

been made, could have been recorded.  The proposition of
Donnallys was one part of a contract; the assent of Parker
the other; the two together made the *"aggregatio mentium,"*
which is essential to the perfect contract.  The statute does
not promise protection to persons who record one-half of a
contract, but to persons who record " any contract in writing,"
meaning thereby the whole contract, " for the conveyance or
sale of real estate."  Now, it is not contended that Parker
agreed to buy this land, either or both tracts, at the date of
the written proposition, or at the date of its recordation.
His deposition will be found on page 44, of this record, and
especial attention is called to it and to his answers to the
third and fourth questions.  It will be observed that he can-
not fix the time or make any nearer approximate estimate
than that it was " previous to the 1st of July, 1856," when he
accepted the proposition.  There are circumstances in the
record that go very far to show that this confessedly loose
recollection of the witness is erroneous.  In his answer to the
sixth question, the witness says he sold the interest in the
27,000 acres to appellants on or about the 15th of October,
1856, evidently correct, because he is refreshed by his deed
(page 34).  The certificate of recordation of the Donnally
proposition shows that it was recorded at the instance of
Hickock and Allen, the appellants, who, evidently, contem-
plated a contract for the purchase of one or both tracts of
land at that time, and whose uncertainty lasted from the 17th
of March till about the 15th of October.  The Donnallys pro-
posed to sell at seventy-five cents per acre.  The appellants,
on or about the 15th of October, agreed to pay Parker one dol-
lar per acre for the Steele land, thus giving Parker a clear
profit of twenty-five cents per acre.  It was this profit (twenty-
five cents per acre,) that produced the *aggregatio mentium* be-
tween the Donnallys and Parker, which was consummated
by their deed to him of the 30th day of September, 1856
(found on page 36).  It was the failure of the appellants to
offer Parker one dollar per acre which prevented an *"agge-
gatio mentium"* between the parties as to the Pocotalico lands.
Parker was evidently in this transaction.  Following a cus-
tom which has long been prevalent in this country relative to
wild lands, he took from the Donnallys a proposition (vulgar-

ly called an option) for two tracts of land. He succeeded in selling one tract at a good commission. He failed to sell the other. He turned the proposition into a contract. By taking a deed, as to one tract, and failing to make a contract as to the other, he left the title to it in the Donnallys. But, for the sake of argument, allow the witness, Parker, to fix the time of his acceptance himself; give him, for the sake of liberality, a month's grace. and say it was verbally accepted on the first of June, 1856, which is all they can claim; and still their recordation is fatally defective. For it must be evident to every one that a contract cannot be recorded before it becomes a contract. Yet, according to the theory of the appellants, the paper was recorded at the time when the Donnallys alone had agreed to sell, and Parker only agreed to buy, months after the recordation.

At this stage of the argument it might be well to inquire what became of the Pocatalico lands. There is no distinction made in the Donnally proposition between the two tracts, yet it is contended that by virtue of the recorded paper, and by that alone, the title to one tract vested and the other did not vest. Otherwise the argument must be that the recorded paper was imperfect at the time of its recordation, but was made a perfect paper by a verbal exchange of words between Parker and Donnally months after the date of recordation, and that by these words there became vested in Parker the ownership of the Steele lands, or he was divested of the ownership of the Pocatalico lands. It is suggested that this dilemma cannot be escaped and that either horn is fatal to the appellants.

It is respectfully submitted that the great cardinal fallacy that runs through the argument of the appellants is this, that they have argued and considered this question as a mere question of contract, without reference to the time when it became a contract. Now the time when is the essential point in the controversy. For if it became a contract after the recordation; then it logically follows that the contract is not recorded, and that the contract is under the statute void as to creditors. The appellants were evidently led into this error by the fact that the reported cases were decided in England and in the States where it is not necessary to record mere

contracts for the sale of lands. This being peculiar to Virginia and West Virginia by statutory law.

It may be well to glance briefly at the authorities so far as they illustrate the following propositions:

1. Was the paper writing found on page 33 valid and binding on any of the parties who executed the same, at its date, or at the date of its recordation?

2. If the paper ever became binding, when?

3. How far the statute of recordation affects the question?

. *First.* In his learned treaty on sales, Mr. Benjamin has examined all the English authorities on the subject of propositions for sales, similar to the proposition made by the Donnallys to Parker, and comes unhesitatingly to the conclusion that these options are void; that there is no contract till acceptance, and if time be given to the proposed purchaser to buy, that the proposed seller has the same time to withdraw his offer. And that if a contract should result from one of this species of propositions, that it dates from the agreement of the minds of the contracting parties, and not from the date of the proposition. See Benjamin on Sales, page 28 to page 32, inclusive, where the English authorities are laboriously and elaborately collated and digested, to page 45 to page 50, where the American authorities are collated and digested.

In *Routledge* vs. *Grant,* 4 Bingham, 653, Best, Chief Justice, remarked, "if six weeks are given on one side to accept an offer, the other has six weeks to put an end to it, one party cannot be bound without the other."

In *Head* vs. *Diggan,* 3d Term R., 148, Bayley, Judge, held in relation to a proposition, "when three days grace from date" was given, and where acceptance was made before the three days had elapsed, that the proposition did not bind the maker, and that "unless both parties are bound, neither is."

In *Eleason* vs. *Henshaw,* 4 Wheaton, 228, the supreme court of the United States hold, "It is an undeniable principle of the law of contracts, that an offer of a bargain by one person to another, imposes no obligation upon the former, until it is accepted by the latter, according to the terms in which the offer was made," * * * * *. "until the terms of the agreement have received the assent of both parties the negotiation is open and imposes no obligation upon either."

In *Tucker* vs. *Woods*, 12 Johnson's Reports, 190, the supreme court of New York decide, "where A. signs a writing, by which he declares he will sell to B. his house, &c., at a certain price, &c., this is a mere proposition, and not a contract.

It would thus seem to be settled law, if the decisions of the courts of kings bench, and exchequer, and of the supreme court of New York, and the supreme court of the United States, can settle a principle of law, that the paper found on page 33 of the record is not a contract, but is, in the words of the decree sought to be reversed, "a mere offer to contract, which offer the said Parker was at liberty, at any time before the 1st day of July, 1856, to accept, in whole or in part, or to entirely reject, and that the recording of said offer did not prevent the lien of the judgment creditors of A. F. and William Donnally from attaching to the lands mentioned and described in the petition, being a portion of the Steele survey of 27,000 acres."

*Second.* It is supposed in the argument of the appellant, that the doctrine as settled by the English courts, New York courts and the supreme court of the United States, has been differently settled in the Massachusetts courts.

This might readily be admitted without weakening the authority of the former courts. But an examination of the Massachusetts authorities does not improve the appellants' case, as a brief citation will show. The case of *The Boston and Maine Railroad* vs. *Bartlett et al.*, 3 Cushing, 224, cited in appellants' argument, is the latest and fullest Massachusetts case, and may, therefore, be relied on as expressing fully the judicial opinion of that State upon the subject under discussion. While the whole case is interesting and will well repay perusal, it is sufficient here to quote the reporter's sylabus.

"A proposition in writing to sell land at a certain price, if taken within thirty days, is a continuing offer which may be retracted at any time, but if not being retracted, it is accepted within the time, such offer and acceptance constitute a valid contract, the specific performance of which may be enforced by a bill in equity."

If the written argument be read in connection with this authority cited in the written argument, it will be seen that confutes almost every point made therein.

The counsel contend that the paper under discussion is an executory contract, the court decided that a paper very similar in character is not a contract, but a proposition or offer. The counsel contend that the offer would be specifically executed in a court of chancery. The court held that it could have been withdrawn at any time before acceptance, and could only be enforced after acceptance.

*Third.* It would then appear that according to this Massachusetts case cited by the appellant himself, that there was never any contract between the Donnallys and Parker until the acceptance of Parker, which acceptance did not occur until long after the recordation of the Donnally proposition; and that therefore there never was any recorded contract between the parties and recordation of the proposition or offer could not intercept the lien of the judgment creditors.

It is therefore happily demonstrated as well by the authority relied on by the appellant as by those relied on by the appellee, that the decree in the court below should be affirmed.

*Smith & Knight,* in reply.

The argument of appellee's counsel is based upon two premises, both of which are wrong. One in point of law, to-wit: That the contract in question was only a proposition to sell and not a complete and valid executory contract at its date; and the other in point of fact, to-wit: That the contract was admitted to record before an election was made thereunder.

It will be noticed that every authority cited in support of the first position are cases of *ex-parte* offers to sell with the making of which the party to whom made, had nothing to do, and have no similarity to the contract in suit.

In support of second proposition, the petitioner's counsel produces assumption, but no proof, although as assailants of the contract the burden is upon them, and he wholly ignores the affirmative evidence in the record that the contract was recorded after election made, and if so recorded, he virtually concedes the case. Petitioner's counsel is not only wrong in his premises, but we submit in his conclusions also, arguing from his premises.

The contract of the Donnallys gave terms and time for an

election, and if the election was made in accordance with the terms and within the time specified, it was a part and parcel of the contract, and would relate back and take effect as of the date of the contract, and its recordation, whether made before or after such election would equally protect the purchaser.

If the Donnallys had executed, acknowledged and recorded an unconditional agreement to sell the land to Parker without his knowledge or assent, and he afterwards accepted the terms of the contract and entered upon the land, and paid the purchase money, will it be claimed that a second recordation of the agreement would be necessary to protect his title? and still more clearly would the second recordation of a contract which expressly gave time for an election, be unnecessary to protect the purchaser who had made the election in accordance with its terms.

We submit, the only question is, could this contract after election was made pursuant to its terms be enforced against the Donnallys, if so, its recordation protects the purchaser.

The answer of Milton Parker referred to in petitioner's brief, as to the time he sold to Hickock and Allen, evidently refers to the time he executed the deed to them, and not to the time of the original contract.

William Allen in his deposition states that the contract was made early in the spring of 1856, and the documentary evidence shows that it was made a few days after the contract between Parker and the Donnallys.

MAXWELL, J. Milton Parker, William Donnally and A. F. Donnally made, and entered into the following agreement, bearing date the 12th day of March 1856.

We hereby agree to sell and to convey to Milton Parker, our interest in a tract of land patented to John Steele of 27,000 acres, and a tract of land lying on the waters Pocotalico, and running into Elk river, for seventy-five cents per acre, one-third of the purchase money to be paid in good acceptances, not to run more than three months, and residue of said purchase money to be paid in equal installments of one, two and three years, with interest from date of deed; but it is understood and agreed that the said Parker is to have till

the first day of July, 1856, to elect whether he will take either or both tracts of said land upon the terms and conditions aforesaid, and it is understood and agreed that the said Parker may elect either of said tracts of land, but is not compelled to take both, but should he elect to take neither, then this contract is null and void; but should said Parker elect to take said tract or either of them, he binds himself to pay for said land at the rate of seventy-five cents per acre for land so elected to be taken by him in the manner aforesaid.

Witness our hands and seals, date as above.

M. PARKER,      (Seal.)
WM. DONNALLY,      (Seal.)
A. F. DONNALLY,      (Seal.)

This agreement was acknowledged by Parker and William Donnally on the day after its date, and by Andrew F. Donnally on the 17th day of March, 1856, on which last day it was admitted to record in the clerk's office of the county of Kanawha. The proof in the record is that Parker elected to take the interest of the Donnallys in the tract of land described in the contract as patented to Steele, upon the terms named in the said contract, and that the said Parker notified the said Donnallys of such election before the 1st day of July, 1856. That on the 30th day of September, 1856, the said Donnallys executed, acknowledged and delivered to the said Parker a deed conveying to him all their interest in and to the said Steele tract of land. That the said Parker afterwards, on the 15th day of October, 1856, sold all his interest in the Steele tract derived from the said Donnallys, to Hickock and Allen, who at that time took possession thereof, and have from that time, by their agents, continued in possession of the same. That the deed from the Donnallys to Parker was recorded on the 3d day of April, 1858; and that after the said Hickock and Allen purchased and took possession of the said tract of land, and before the time when the said deed from the Donnallys to Parker was admitted to record, judgments were obtained against the said Donnallys.

The sole question for determination here, is whether or not the said judgments so obtained are liens upon the interest of the Steele tract of land conveyed by the Donnallys to Parker.

It is insisted for the appellees that the paper purporting to

be an agreement, bearing date on the 12th day of March, 1856, is nothing more than a proposition on the part of the Donnallys to sell to Parker the land mentioned in it, if the said Parker should elect before the 1st of July following to buy the land; and being only a proposition to sell, they have a right to withdraw it at any time. The paper was not only a proposition to sell, but a covenant that such proposition should remain open for acceptance until the time specified in it; but whether the proposition could have been withdrawn or not, does not arise in this case, as it was not in fact withdrawn, or any attempt made to withdraw it, and became complete on the election of Parker to take the Steele tract under it, upon giving to the Donnallys notice of his election. An executory contract was thus completed between the Donnallys and Parker, as to the Steele tract, that might have been specifically executed in a court of equity. *The Boston and Maine Railroad Company* vs. *Bartlett*, 3 Cushing, 224.

The next question is as to the effect of the recordation of this contract to protect the property mentioned in it, from the liens of the judgments against the Donnallys, under the fifth and sixth sections of chapter 74 of the Code, p. 474, which sections contain the same provisions found in the Code of Virginia, in force at the time the contract was entered into. .

When Parker made his election under the contract, and gave notice of such election, his equitable interest in the Steele tract of land related back to the date of the contract. *Daniels* vs. *Davison*, 16 Vesey, Jr., 249; *Broome* vs. *Monck*, 10 Vesey, Jr., 597; *Seton* vs. *Slade*, 7 Vesey, Jr., 265; *Paine* vs. *Meller*, 6 Vesey, Jr., 349; *Steinback* vs. *Stewart*, 11 Wallace, 566.

The provision in the contract giving to Parker the right of election was sufficient to put the creditors of the Donnallys on inquiry, and they were bound to inquire whether such election was made or not. *Smith* vs. *Low*, 1 Atkyns Rep., 489; *French* vs. *The successors of the Loyal Co.*, 5 Leigh, 627.

The decree complained of will have to be reversed, with costs to the appellants, and the cause remanded.

The other judges concurred.

DECREE REVERSED.